NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0130n.06
Filed: March 4, 2008

No. 07-5235

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT


MICHAEL TURNER,

                **Plaintiff-Appellant,**                        ON APPEAL FROM THE
                                                              UNITED STATES DISTRICT

v.                                                 COURT FOR THE EASTERN
                                                               DISTRICT OF KENTUCKY

COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant-Appellee.**

_____/

**BEFORE: BOGGS, Chief Circuit Judge; GIBBONS, Circuit Judge; and BELL, Chief District Judge.**[*]

       **BELL, Chief District Judge.** Plaintiff-Appellant Michael Turner appeals the district court's decision affirming Defendant-Appellee Commissioner of Social Security's denial of disability benefits. Turner argues that the Administrative Law Judge ("ALJ") erred in rejecting the opinions of Turner's treating physicians. For the reasons set forth below, we affirm the judgment of the district court.

I.

_____

      [*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

Michael Turner was born on August 1, 1961. He attended school through the eighth grade. For over twenty years Turner worked as a dipper in a plant that manufactures truck radiators. This job required Turner to put brass plates on the tops of radiators, dip them in a chemical solution, dip them in hot lead, and then pick them up and allow the lead to drip off. In that capacity, Turner was required to regularly lift between 75 and 125 pounds. Turner's employment at the truck radiator plant ended on April 28, 2004, for reasons related to his alleged disability.

Turner applied for Social Security Disability and Disability Insurance Benefits on May 4, 2004, alleging disability as of April 28, 2004, due to degenerative disc disease and chronic lumbar pain. Turner also filed an application for Supplemental Security Income on May 18, 2005. After his application was denied initially and on reconsideration, Turner requested a hearing before an ALJ. On January 24, 2006, the ALJ determined that Turner was not disabled. On March 29, 2006, the Appeals Council denied Turner's request for review, "at which point the ALJ's decision became the final decision of the Commissioner of Social Security." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004) (citing *Miles v. Chater*, 84 F.3d 1397, 1399 (11th Cir. 1996)). On May 15, 2006, Turner filed a civil action in federal district court. On December 19, 2006, the district court affirmed the Commissioner's denial of benefits and this appeal timely followed.

II.

Judicial review of a final decision of the Commissioner of Social Security is limited to determining whether the ALJ applied the correct legal standards in reaching her decision

and whether there is substantial evidence in the record to support her findings. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). This court reviews the district court's legal conclusion that the ALJ's decision was supported by substantial evidence de novo. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). "'Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (quoting *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509 (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)). The Commissioner's findings of fact, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

## A.

Turner argues that the ALJ erred in giving greater weight to the opinion of Dr. Richard Watson than to Turner's treating physicians, Drs. John Kelly and Jeremy Engel. Dr. Watson was retained by the Social Security Administration to evaluate Turner's medical condition. Dr. Engel was Turner's initial treating physician. Dr. Engel referred Turner to Dr. Kelley, a neurologist, who began treating Turner on March 31, 2004.

In November 2003, Dr. Engel placed Turner under work restrictions. Turner's employer did not have a permanent position that would accommodate the restrictions, but offered to reduce the amount of lifting done by Turner for two months. Dr. Kelly agreed with this plan. On January 30, 2004, Dr. Engel imposed the following work restrictions:

frequent lifting limited to five pounds, occasional lifting limited to ten pounds, standing

limited to thirty minutes, and sitting limited to twenty minutes. Dr. Engel based these

limitations on the November 14, 2003, magnetic resonance image ("MRI") of the disc

between vertebrae nine and ten of the thoracic spine and on Turner's kidney stones.

Dr. Engel had based the November 2003 restrictions on this same MRI. The interpreting

radiologist described the results of the November 14, 2003, MRI of Turner's thoracic spine

as follows:

> There is a preservation of vertebral body height and disc space throughout the
> thoracic spine. There is no intrinsic cord abnormality. There are tiny left
> paracentral disc protrusions at T5-6 and T6-7. There are also small disc bulges
> at T9-10 and T10-11. None of these protrusions or bulges compress the thecal
> sac in a significant way or compress the cord.

(Admin. R. 125.) Dr. Kelly's notes on the results of the November 14, 2003, MRI reflect that

the MRI of Turner's lumbar spine was "normal" and the MRI of his thoracic spine showed

"[t]iny disc protrusions, inconsequential and noncompressive." (*Id.* at 144.) With respect

to Turner's kidney stones, he complained of right flank pain on November 27, 2001, and a

January 20, 2002, x-ray showed evidence of kidney stones.

On March 31, 2004, Turner advised Dr. Kelly that his employer could not

accommodate Dr. Engel's twenty-pound lifting restriction.[1] In the absence of an

accommodation, Turner had continued with unrestricted work. Dr. Kelly advised Turner to

move to less physically demanding employment. Dr. Kelly's physical exam of Turner on

---

[1]The administrative record does not indicate when Dr. Engel imposed the twenty-pound lifting restriction.

March 31 found normal muscle strength and tone, no atrophy in the lumbar or lower extremity musculature, sensory exam was intact, normal spontaneous gait, and moderate thoracolumbar paraspinous tenderness with a palpable paraspinous low grade muscle spasm. The exam revealed a range-of-motion for lumbar flexion of 75 degrees, lumbar extension of 20 degrees, left lateral bending of 30 degrees, and right lateral bending of 30 degrees. On April 30, 2004, two days after Turner's employment terminated, Dr. Kelly assessed Turner's condition as follows:

> Michael basically has a repetitive strain injury from the work that he does. We again had a long discussion about this. There is not really a medical solution to this problem. I can suppress his pain somewhat, but not actually resolve or control this condition and it will progress so long as he continues the present work activities.
>
> I have placed him on work restrictions today and I feel that his best recourse is to go out on disability.

(Admin. R. 149.) Dr. Kelly's physical exam of Turner on April 30 was identical to the March 31 exam. On May 21, 2004, Dr. Kelly reiterated the need for Turner to cease doing highly repetitive work. Dr. Kelly's physical exam of Turner on May 21 was identical to the April 30 exam except there was no tenderness or muscle spasm and Turner's lumbar flexion had decreased to 45 degrees. At the June 9, 2004, exam, Dr. Kelly noted that Turner had ceased doing such highly repetitive work. Dr. Kelly's physical exam of Turner on June 9 was identical to the May 21 exam. On July 22, 2004, Dr. Kelly concluded that Turner was "permanently occupationally disabled." (Admin. R. 161.) Dr. Kelly imposed the following restrictions:

1.      No lifting or carrying more than 5 lbs infrequently.
2.      No pushing or pulling more than 10 lbs very infrequently.
3.      No bending, stooping, or crawling.
4.      No driving automobile or operating dangerous machinery due to medication side effects.
5.      Must be allowed to change positions as needed for comfort. Specifically he is unable to sit for more than 30 minutes at one time or more than 3 hrs [*sic*] per day without changing positions. He is unable to stand or walk for more than 15 minutes at one time or more than one hour cumulative per day.

These restrictions are permanent. Michael is permanently disabled and will never be able to return to work. He has been encouraged to apply for disability benefits.

(Admin. R. 165.) Dr. Kelly's physical exam of Turner on July 22 was identical to the May 21 and the June 9 exams. Dr. Kelly again examined Turner on October 14, 2004, and May 26, 2005, and the results of those exams were identical to the May 21, June 9, and July 22 exams.

Dr. Watson testified at the January 12, 2006, hearing before the ALJ. Dr. Watson did not examine Turner. Instead, Dr. Watson formed his opinion by reviewing Turner's medical records. Dr. Watson concluded that Turner could do sedentary to light work. Dr. Watson recommended the following restrictions: frequent lifting limited to ten pounds, occasional lifting limited to thirty pounds, sitting limited to one-hour increments, with a total limitation of seven hours per day, standing/walking limited to one-hour increments, with a total limitation of four hours per day. Dr. Watson disagreed with the work restrictions imposed

by Drs. Engel and Kelly because in his view Turner's medical records lacked evidence of the radiculopathy[2] and structural problems that would warrant the restrictions they imposed.

Dr. Donald Shrier testified as a vocational expert. Dr. Shrier testified that Turner could do unskilled sedentary work based on the functional limitations described by Dr. Watson. The specific jobs he identified were hand-packing, bench assembly, and production inspection. Dr. Shrier also testified that Turner would be unable to work based on the functional limitations described by Dr. Kelly.

B.

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984), and 20 C.F.R. § 404.1527(d)(2)). However, "[t]he treating physician's opinion must be supported by sufficient medical data." *Jones*, 336 F.3d at 477 (citing *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). "If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as [she] sets forth a reasoned basis for her rejection." *Id.* (citing *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)). In discrediting the opinion of a treating source the ALJ must consider the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, the specialization of

---

[2]Radiculopathy is "disease of the nerve roots." *Dorland's Illustrated Medical Dictionary* 1595 (31st ed. 2007).

the treating source, and other factors that tend to support or contradict the opinion. 20 C.F.R.

§ 404.1527(d)(2)(i-ii), (d)(3-6) (2007); *Wilson*, 378 F.3d at 544.

The ALJ found Dr. Watson's opinion to be more consistent with the clinical evidence.

In Dr. Watson's opinion, the clinical findings that one would expect to find in a person with

the conditions diagnosed by Dr. Kelly were not present. Dr. Watson specifically indicated

that to support Dr. Kelly's diagnosis one would expect radiculopathy, structural problems,

or a greater loss of range-of-motion. The ALJ concluded that Drs. Engel and Kelly's

diagnoses were "almost entirely" based on Turner's subjective reports. (Admin. R. 20.) The

ALJ also noted that she did not find Turner's subjective reports "entirely credible." (*Id.*)

Lastly the ALJ noted that Dr. Engel's work restrictions were inconsistent with Turner's own

testimony about his ability to engage in physical activity.

In evaluating the medical opinions, the ALJ properly considered whether the doctors

presented relevant clinical evidence to support their opinions. 20 C.F.R. § 404.1527(d)(3)

("The more a medical source presents relevant evidence to support an opinion, particularly

medical signs and laboratory findings, the more weight we will give that opinion. The better

an explanation a source provides for an opinion, the more weight we will give that

opinion."). The ALJ identified the following areas where the medical evidence was

insufficient to support the conclusions of Drs. Engel and Kelly:

> The claimant clearly experiences pain from his lumbar strain. However, there
> is no evidence of nerve root involvement and no diagnostic studies confirming
> any radiculopathy that would make his leg hurt to the extent he alleges.
> Straight leg raising is negative, and MRIs and x-rays have shown only mild

degenerative changes. He does not walk with an antalgic gait,[3] he has been observed sitting with no antalgic behaviors, and his clinical findings have been normal except for occasional spasm and varying range of motion limitations. Further, as noted below, medical expert Dr. Watson said that the claimant's overall range of motion really is not significantly restricted. Ultimately, the combined diagnostic and clinical findings do not correspond to the claimant's reported subjective pain.

(Admin. R. 19.) The ALJ set forth a reasoned basis for rejecting the opinions of Turner's treating physicians by identifying the foregoing areas where medical evidence was lacking as well as by analyzing the work restrictions imposed by Drs. Engel and Kelly. Thus, the greater weight that the ALJ accorded to the non-treating physician, Dr. Watson, was permissible.

Dr. Kelly also stated that in his opinion Turner is "permanently disabled" or "permanently occupationally disabled." (Admin. R. 161, 165.) The ALJ disregarded this part of Dr. Kelly's opinion. "'The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician.'" *Warner*, 375 F.3d at 390 (modification in *Warner*) (quoting *Harris*, 756 F.2d at 435). Moreover, the opinion of a medical source that a person is "disabled" is not entitled to any "special significance" as that determination is reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(1), (e)(3). Thus, the ALJ did not err in not deferring to Dr. Kelly's determination that Turner is "permanently disabled."

Turner does not dispute the vocational expert's testimony independent of his objection to the ALJ's reliance on Dr. Watson's opinion. The vocational expert testified that based on

---

[3]An antalgic gait is a "limp adopted so as to avoid pain on weight-bearing structures (as in hip injuries), characterized by a very short stance phase." *Dorland's Illustrated Medical Dictionary*, *supra*, at 764.

the residual functional capacity described by Dr. Watson there are jobs that Turner can do and those jobs exist in significant numbers, though Turner would be unable to resume his work dipping truck radiators. The ALJ concluded that there are jobs that Turner can do and those jobs exist in significant numbers.

Although generally an ALJ must give deference to the opinions of treating physicians, in this case the ALJ set forth a reasoned basis for rejecting the opinions of the treating physicians. The ALJ's opinion with regard to the opinion of the non-treating physician and the associated conclusion that Turner is not under a period of disability are supported by substantial evidence. Therefore, the district court properly affirmed the ALJ's opinion.

III.

For the foregoing reasons, we AFFIRM the judgment of the district court.